FILED
JAN 14 2002

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| ALICE TORRES ) | CIV. 01-5056 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | BRIEF IN SUPPORT OF |
| ) | PLAINTIFF'S MOTION |
| TRAVELERS INSURANCE COMPANY; ) | TO COMPEL |
| INSURANCE COMPANY OF THE STATE ) | |
| OF PENNSYLVANIA; and ) | |
| CONSTITUTION STATE SERVICES, ) | |
| formerly known as CONSTITUTION STATE ) | |
| SERVICE COMPANY. ) | |
| ) | |
| Defendants. ) | |

## INTRODUCTORY STATEMENT

The plaintiff has issued interrogatories, document requests, and deposition questions which defendants have either objected to, or in some instances simply refused to supply responses. Defendants have made a motion for a protective order for certain discovery requests, but this motion to compel, and brief and support, addresses separate discovery requests that were not the subject of the defendants motion for protective order. Copies of the interrogatory answers and responses to document requests are attached hereto.

## STATEMENT OF FACTS

For the statement of the facts, we would ask that the court refer to Plaintiff's Brief in Opposition to Defendant's Motion for a Protective Order. However we will provide here the following summary:

- Beverly Enterprises is self-insured for any worker's compensation claims of less than $1 million.

1

Torres v. Beverly Enterprises, Inc. *et al.*  
Brief in Support of Plaintiff's Motion to Compel

Civ. 01-5056

- Beverly Enterprises pays its supervisory personnel bonuses and other financial incentives to minimize worker's compensation costs.

- Alice Torres developed carpal tunnel syndrome from her work at Meadowbrook Manor, and her doctors said it was work related.

- At first Alice's employer agreed it was work related and paid for several office visits to the doctor, but when her doctor said she needed surgery and a month off of work, Alice's supervisor denied her claim without even notifying the claims department, and told her doctor's office to claim it on health insurance instead of worker's compensation.

- When the Alice's supervisor did finally notify the claims department of her claim, he did so along his opinion that he did not feel her injury was work related, and the claims representative issued a denial letter the same day without even reviewing Alice's medical records.

- Thereafter, for over a year the company claims handlers repeatedly denied Alice's claim on a basis they knew all along to be false.

- The Company repeatedly ignored un-refuted medical evidence that Alice's carpal tunnel syndrome was caused by her work.

- The Company insisted on fully litigating Alice's claim, and then at the hearing called no witnesses.

- The Company claims representatives now say that Alice's claim was handled according to standard operating procedure, and they see nothing wrong with the processing of her claim.

The following are the areas of discovery that defendants refuse to answer, saying they are irrelevant.

### THE ESTABLISHMENT OF COMPANY FINANCIAL GOALS FOR PAYMENT OF WORKER'S COMPENSATION BENEFITS

Plaintiff seeks to show that defendants are paying bonuses or extra compensation to more than just the facility directors, as we have already established. Plaintiff seeks to show that claims

2

personnel are also being given financial incentives who help minimize claims paid to injured worker's. Defendants refuse to provide the documents requested.

The setting of payment goals for claims handlers has been condemned as a bad faith practice in jurisdictions with bad faith law similar to ours. *Campbell v. State Farm*, 432 Utah Adv. Rep. 44, 2001 Utah 89, ___ P.3d ___ (Ut. Oct. 19, 2001); *Zilitch v. State Farm Mutual Auto Insurance Company*, 995 P.2d 276 (Az. 2000); *Hawkins v. Allstate Insurance Co.*, 733 P.2d 1073 (Az. 1987). Plaintiff believes this discovery will show that defendants here are employing a strategy which is very common in today's insurance industry:

**GOALS**: The company examines the amount of money it has paid in worker's compensation claims in the past, and then determines *how much it would like to be paying instead*. The company then sets various types of financial goals for the payment of claims.

These goals are stated in various ways. They will be expressed in terms of minimizing overall, companywide gross claim costs. They will be expressed in terms of minimizing costs per facility. They will be stated in terms of minimizing the "worker's compensation rate", which is the ratio of total claim costs as divided by total payroll costs. These goals will be discussed in the files of Beverly's Loss Control Manager's office, in memos and communications between Beverly and the people in charge of handling claims (CSSC). They may be discussed in performance evaluations of employees, in claims manuals, and in all of the types of documents requested by plaintiff in the discovery which defendants have refused to answer.

**TRACKING:** Once the goals are set, the company devises ways to track the

Torres v. Beverly Enterprises, Inc. et al.
Brief in Support of Plaintiff's Motion to Compel

Civ. 01-5056

actual achievement of the goals. This is done through constant tracking of the company's vital statistics, such as:

- How much has the company been spending for total claims?
- How much has the company reserved for total claims next quarter/year?
- What are the same figures for expenditures and reserves for each facility?
- Which facilities have the best performance, and which have the worst?
- What is the breakdown of claims paid in terms those that are less than $5,000, more than $5,000? etc...
- What types of injuries are causing the most claims/costing the most money?
- What types/percentage of claims are successfully denied without having to pay anything (called CWP...or "closed without payment" claims)

**PERFORMANCE EVALUATIONS, "QUALITY ASSURANCE REVIEWS" AND BONUSES**: The company doesn't just leave the achievement of these goals to chance. The company will conduct continuous "Quality Assurance Reviews" where individual claims files are audited by supervisors on a random basis to insure that claims representatives are handling claims the way the company wants them to do it. Then, the company might pay bonuses directly to claims handlers, or perhaps the company may only reward the supervisors, inducing them to monitor their subordinates as closely as possible to make sure they are minimizing claims payments. We have already seen that at Beverly, the director of each facility is given bonuses for

minimizing costs. Those who do not achieve the goals will not have a very bright future with the company.[1]

## THE PLAINTIFF'S DISCOVERY REQUESTS

1. **Company Worker's Compensation Statistics, Methods of Reporting, and Company Goals for the Paying of Claims.**

In plaintiff's interrogatories and document requests, we seek information concerning the company's "vital statistics" and the methods of reporting those statistics. We also seek information about company goals for payment of claims, and how the compensation of claims handlers is tied to the goals. All have been refused by defendants as irrelevant. For instance:

- Interrogatory No. 7 and document request 52 ask defendants to **describe** and produce any monthly, quarterly or annual reports of worker's compensation claim payment statistics from CSSC. Document request 54 asks for any documents showing communications between defendant CSSC and Beverly with respect to administration of worker's comp. claims.

---

[1] Actually, there is nothing illicit about these strategies *in the context of ordinary business management.* These strategies have been taught in business management schools for over forty years as variations of the "Management By Objectives" (MBO) theory. The problem arises when these strategies are used by companies that are involved in handling fiduciary like transactions (i.e....insurance claims). Fiduciary transactions are governed by a different set of rules. The first rule of conduct concerning insurance transactions is that the company will give *at least equal consideration to the interests of the claimant. Kunkel, v. United Security Ins. Co. of New Jersey,* 168 N.W. 2d 723 (S.D. 1969). This rule is blatantly violated when a company secretly pays its employees *more* as a reward for paying claimants *less*. Thus, in the context of processing insurance claims, the courts have condemned these strategies as trickery and deceit against claimants. *Campbell v. State Farm,* 432 Utah Adv. Rep. 44, 2001 Utah 89, ___ P.3d ___ (Ut. Oct. 19, 2001); *Zilitch v. State Farm Mutual Auto Insurance Company,* 995 P.2d 276 (Az. 2000); *Hawkins v. Allstate Insurance Co.,* 733 P.2d 1073 (Az 1987).

5

- Interrogatory No. 5 asks for statistics showing the breakdown of work comp claims actually paid by the company in terms of those below $5,000, those between $5,000 and $10,000, etc.[2]

- Document requests 12, 33, 34, 36, 37, 45, 48, and 53 all ask for documents relating to goals set for the payment of claims by CSSC, or communicated to CSSC by Beverly. document requests 38, 46, and 49 all ask for documents that show that the level of claims payments have any influence on bonuses, salary increases, or promotions, or compensation of any kind for defendants' employees.

2. **Previous Company Employees.**

Interrogatory 10 seeks to identify the names of CSSC employees in the work comp claims department who have left the company since January 1, 1994. This is not burdensome. In response to Interrogatory No. 9 defendants have confirmed that there are were only 14 employees in that department in 1999 when Alice's claim was denied. Therefore, we are not asking for hundreds of names here. The information is relevant. Many cases of institutional bad faith have been exposed by the testimony of former employees who no longer depend on the company for a

---

[2] This request is not burdensome. Defendants already have this information in their possession. This is the kind of information routinely collected by every insurance company in the ordinary everyday course of business. This information is relevant, because it will likely show that most claims fall on the low end of the financial scale, and it will likely show a high statistical occurrence of claims in this category that are closed without payment, (actuaries call this "CWP" claims...which is another category of information closely tracked by insurance companies). The evidence will show that small claims like Alice's are much easier to close without payment because it is financially unfeasible for the injured worker's to retain attorneys or otherwise effectively contest the denial. The evidence will show that on small claims, the Company usually wins by default whether the denial is proper or not. This is an important fact for claims personnel who are pressed to meet company goals and earn bonuses.

6

living. In both *Hawkins v. Allstate and Campbell v. State Farm*[3], former employees gave testimony about the company training them to illicitly minimize payments, and coercive performance evaluations which forced employees to cheat customers or lose their jobs. In short, this could easily lead to relevant evidence.

3. **Previous Lawsuits and Previous Carpal Tunnel Claims**.

Interrogatory No. 11 seeks information about previous bad faith lawsuits against CSSC for alleged wrongful denial of Beverly work comp. claims. Interrogatories No. 12 and 13 seek information about previous work comp. claims filed over the past several years with respect to denials of carpal tunnel claims for Beverly employees. These documents would allow the plaintiff to learn exactly what experience the defendants have in handling other claims similar to hers. This kind of evidence can be highly relevant. For instance, it could show whether the company has already asserted the same frivolous defenses in other similar cases. Perhaps in a previous case the shoe was on the other foot and the defendants themselves argued that *an employee could not get carpal tunnel from a single incident of trauma*. In short, if these people have been through all of these things before, perhaps many times, they should not be able to now feign ignorance or claim mistake about the fact that they knew they had no reasonable basis to deny this claim.

This discovery is not burdensome on CSSC. One of our discovery requests asked the defendant to identify its computer search capabilities. Defense counsel responded as follows:

---

[3]*Campbell v. State Farm*, 432 Utah Adv. Rep. 44, 2001 Utah 89, ___ P.3d ___ (Ut. Oct. 19, 2001); *Zilitch v. State Farm Mutual Auto Insurance Company*, 995 P.2d 276 (Az. 2000); *Hawkins v. Allstate Insurance Co.*, 733 P.2d 1073 (Az 1987).

7

Torres v. Beverly Enterprises, Inc. *et al.*  
Brief in Support of Plaintiff's Motion to Compel

Civ. 01-5056

> I can also tell you...that CSSC's computer system can search by claim adjustor, by year, by type of injury, by facility. I have a copy of a listing for claims from 1/1/98 to 12/31/98 for Beverly Enterprises that represents denied and litigated claims.

(Pat Meyers letter of 12/11/01).

There are no confidentiality issues. The litigated claims are public record in the various jurisdictions where they occurred. With respect to the un- litigated claims, the names of the claimants can either be redacted, or the plaintiff will agree to a protective order with respect to the identities of the claimants, and will not disclose those names to anyone, nor will plaintiff contact the claimants, without specific permission of the court.

4. **Corporate Philosophies**.

Document Requests 39 through 43 ask for documents relating to corporate philosophies on the subject of paying claims. For instance, interrogatory 39 asks for copies of company newsletters since 1994 that are published by the home office and disseminated to employees.

These newsletters frequently contain information about employee bonus programs, incentive programs to minimize claim costs, profiles of outstanding employees who are examples that the company wants others to follow, and generally show the company's attitude toward handling claims. For instance, in State Farm's employee newsletter, entitled "Obiter Dictum", the president of the company exhorted his claims handlers to "focus" their claim investigations "on the company's best line of defense."[4] He told them that they were the company "big spenders"

---

[4] The law requires a fair investigation that gives equal consideration to the rights of the insured, not a one sided investigation that just looks for ways to deny a claim.

8

and admonished them to "spend State Farm's money as if it were your own."[5] The State Farm newsletter also contained heroic stories of adjustors who had managed to settle a case of facial disfigurement to a child for the exemplary sum of $10,000, when the company had actually reserved $50,000, thus saving the company money and "sparing the child from a trial." The newsletter contains countless other illustrations of the company's attitudes, such as one article entitled "Honor Thy Father and Thy Mother, But Not the Subpoena." In short, the kind of information contained in these newsletters can be very relevant to show a company fostered attitude of treating claimants like vermin.

Document Request 40 asks for any videotaped, recorded or written training materials used by defendants on the subjects of claims adjusting, and interpretation of coverage. Document requests 41 asks for the code of ethics and bylaws of any trade groups of insurers or claims administrators of which defendants are a member. Request No. 42 asks for documents which set forth defendants philosophies on claims handling, providing service to claimants, good/bad faith claim handling, and wrongful claims handling. Request No. 43 asks for copies of transcripts or recordings of speeches or presentations made by CSSC's personnel or legal counsel on the subject of handling worker's compensation claims.

All of this kind of information can be incredibly relevant. For instance, in *Campbell*, the court received evidence that in defending claims, the company intentionally harasses claimants and their lawyers. In a videotaped training speech given at the national meeting of State Farm claims

---

[5] Again violating the rule of "equal consideration."

9

superintendents, company legal counsel bragged that "We tie plaintiffs up in motions for weeks and months. It's the old 'mad dog defense tactic', but it works." In another statement in that same video-taped speech, counsel told the claims handlers that he told them that above all, the company lawyers resist providing discovery of other claims files "because, believe me, they will find something that will hurt!" He told them that "there is nothing more important than protecting the company's treasury." He told them how important it is to prepare witnesses, because "truth is illusory", and in preparing for trial "we create a memory for the person."

Obviously, this kind of evidence is relevant to show malicious intent. If the defendants have transcripts or recordings of training seminars or other speeches responsive to this request, they should be provided.

5. **Agreements Between the Defendants, or Agreements with Beverly Enterprises Showing the Contractual Relationships Between these Parties**.

In Document Requests 44 through 49, plaintiff seeks to discover all contracts between these companies that define their relationship and duties with respect to handling and paying work comp. claims for Beverly. The contracts between these parties are essential to show who is liable for the conduct in this case. For instance, here is what we already know about the relationships between the parties:

- **The Insurance Company of the State of Pennsylvania**: A defendant in this action. Listed by the filings with the South Dakota Division of Labor as providing the worker's compensation insurance coverage for Beverly Enterprises.

- **Constitution States Services Company (CSSC)**: A defendant in this action. CSSC is either a wholly owned subsidiary or branch of Travelers Insurance Company and it has a

10

Torres v. Beverly Enterprises, Inc. *et al.*                                                                Civ. 01-5056
Brief in Support of Plaintiff's Motion to Compel

contract to administer all of the worker's compensation claims for Beverly Enterprises in all of the Beverly facilities across the country.

- **Travelers Insurance Company:** A named defendant. Owns or operates CSSC. Plaintiff has sued the Insurance Company of the State of Pennsylvania (Pennsylvania), because it is listed by Beverly Enterprises in its filings with the South Dakota Department of Labor as the entity which provides worker's compensation insurance to Beverly Enterprises.

Pennsylvania has signed a contract with CSSC to administer all of Beverly's worker's compensation claims, and CSSC handled Alice Torres's claim in this case. The plaintiff has sued CSSC for bad faith and seeks to amend to add a claim of barratry under SDCL 20-9-6.1.

Finally, plaintiff has sued Travelers Insurance Company, because CSSC is owned or operated by Travelers and is apparently an agent of Travelers. However, CSSC is actually physically located at Beverly's national headquarters at Fort Smith Arkansas, suggesting that it may actually be largely under the control of Beverly[6]. As the court can obviously tell just from the facts already provided, the court will need to know the exact contractual arrangements between the parties and the contractual arrangements with Beverly before the court will be in a position to

---

[6]South Dakota statutes allow for a deductible arrangement between employers and work comp insurers, but in order to protect the integrity of the claims handling and payment proceedures, require that the claim handling be under the control of the insurance company, with claim payments also made by the company and then reimbursed by the employer. SDCL 62-5-20. This elaborate arrangement between Beverly, Pennsylvania, Travelers, and CSSC seems to be an effort to circumvent this statute. Although CSSC is ostensibly charged with handling Beverly claims, by all indications CSSC's work is under Beverly's control, with its offices even located at Beverly's corporate headquarters. In fact, the checks paid to Alice Torres after she prevailed at hearing, were written from Beverly's account, instead of Pennsylvania's account as required by statute. The true meaning of all these facts can only be determined with appropriate discovery of the agreements between these parties.

11

rule on summary judgement as to who is a proper party and who is not a proper party. The court will need to know those facts in order to properly instruct the jury, and the jury will need to know those facts in order to decide who actually had what duties to the plaintiff, and who was actually in control and might have breached that duty. However, defendants have asked for a protective order to bar discovery of these facts.

6. **Questions that Defense Attorney Mike Hickey Refused to Answer in his Deposition.**

Plaintiff took the discovery deposition of attorney Michael Hickey on December 19, 2001. Mr. Hickey represented Beverly and Pennsylvania in the underlying worker's compensation litigation. He filed pleadings in that case claiming that Alice had failed to provide the statutory notice of injury, and that her carpal tunnel syndrome was not compensable under the worker's compensation law of South Dakota. He then delayed the hearing for many months, claiming to need more time to prepare, then when the hearing came he called no witnesses. Plaintiff believes that the defendants and their lawyer filed pleadings known by them to be false, and asserted defenses known by them to be false and inapplicable to these facts under well established South Dakota law. Plaintiff has now filed a motion to amend the complaint to add Beverly as a defendant, and also adding a cause of action for barratry against Beverly and the other defendants under SDCL 20-9-6.1.

In order to explore these issues, plaintiff sought to depose Mr. Hickey regarding what he knew about the South Dakota Supreme Court decisions relating to the claims and defenses he

12

Torres v. Beverly Enterprises, Inc. *et al.*  
Brief in Support of Plaintiff's Motion to Compel

Civ. 01-5056

filed. On the advice of defense counsel, Mr. Hickey refused to answer many of these questions, claiming that he need not provide legal opinions to the plaintiff and that his opinions are irrelevant.

This is a bad faith case. The entire issue is whether the company and its agents denied or delayed payment of the claim without a reasonable basis, and with knowledge of a lack of a reasonable basis. See *Walz v. Fireman's Fund*, 1996 SD 135, 556 NW2d 68. The answer to this question requires an inquiry into both the facts AND the applicable law, and the company's knowledge of BOTH. As stated by the South Dakota Supreme Court in *Walz*:

> Whether the Insurer acted in bad faith in conducting an inadequate investigation <u>or failing to review case law</u> is a question of fact for the jury...*Isaac v. State Farm*, 522 NW2d 752,758 (SD 1994) (citation omitted). The issue is determined based upon the facts <u>and law</u> available to Insurer at the time it made the decision to deny coverage....*Isaac* <u>instructs us to look not only to the facts, but also to the law available to the insurer at the time it made the decision to deny coverage</u>. (Emphasis added).
> *Walz* at 70-71.

In addition, Alice also seeks to amend the complaint to add a claim for Barratry under SDCL 20-9-6.1. The elements of barratry are the assertion by a party of any frivolous or malicious claim or defense or the filing of any document with malice or in bad faith. With these elements, the question of whether a party and their lawyer knew that the law did not support their claims is obviously relevant.

The following are some examples of Mr. Hickey's refusal to answer these questions. For instance, with respect to the defense asserted by Mr. Hickey that Alice had failed to give notice:

> Q: Do you know what the statement of law is in South Dakota with respect to notice in the context of a progressive injury?

13

Torres v. Beverly Enterprises, Inc. *et al.*  Civ. 01-5056
Brief in Support of Plaintiff's Motion to Compel

> A:   Do I know? I think I do.
>
> Q:   Can you tell me what it is?
>
> MS. MEYERS:   I don't think you have to tell him what it is. It, again, calls for your own legal opinions.
>
> A:   I choose not to do that.[7]

(Hickey depo. pp. 25-26)

> Q:   OK. I'm not going to ask you for an opinion. I'm going to ask you, as a matter-of-fact, has the South Dakota Supreme Court stated that in the insurance context the company must treat the insured's interests with equal regard as it does its own interests?
>
> A:   Well, again, I think that calls for a legal conclusion. I don't have an opinion on that.

(Hickey depo. pp.15-16)

\* \* \*

> Q:   Well, I'm not asking you to interpret anything. I'm asking you whether the Supreme Court has said exactly that?
>
> A:   Well, I- I would prefer not to answer those questions.

(Hickey depo. pp.15-16)

---

[7] Mr. Hickey claimed that Alice had failed to give any form of written notice. In fact, she gave written notice the same day that the doctor diagnosed her problem, along with verbal notice to her supervisor, and the next day she gave the company a tape recorded statement. In *Tiezen v. John Morrell*, 528 NW2d 401 (S.D. 1995), the court said that when an injury is gradual and progressive, such as carpal tunnel syndrome, there is no duty to give notice until the pain prevents the employee from continuing to work. Alice missed no work prior to her written notice to the employer on March 2, 1998. The evidence in this case provided no support whatsoever to this defense. Now Mr. Hickey refuses to answer questions about his knowledge of the notice requirements under the law.

14

Finally, Mr. Hickey refused to answer any questions that would allow an assessment of whether he had a reasonable factual basis for the defenses he asserted:

Q: ...when you filed an answer the denying compensability and denying coverage, did you stop to think why you were doing that?

A: I don't remember.

Q: But would be wrong to file an answer denying compensability without stopping to think why and whether you have sufficient reasons-

MS. MEYERS: I object-... I'm going to object because, again, that is the general question and it's not related to the specific case. I think there's case law out there, and I cited it to you, Mike, that says what I lawyer does and defenses he may or may not assert in an answer are not relevant to the issue bad faith and beyond that, I think it gets into his practice of law and his legal conclusions in how he handles cases and he doesn't have to answer it.

A: I'm not going to answer that.

(Hickey depo. pp.38-39)

\*   \*   \*

Q: Well, going down to paragraph No. 3 of your answer, you claim that the injury did not arise out of her employment.

A: Yes.

Q: Why did you make that claim... what facts did you have or know about to suggest that that was an appropriate thing to argue?

MS. MEYERS: ... I object and assert the privilege.

Q: Will you answer?

15

A:  No.

(Hickey Depo. P. 44)

\* \* \*

Q:  Has CSSC or Beverly then sued in other cases for bad faith arising out of cases that you represented them in?

(Objections made by defense counsel)

Q:  Do you choose not to answer?

A:  Yes.

Q:  Why not? I mean, if there aren't any, why be unreasonable about it?

A:  Well, that's- you can draw that conclusion, Mike. I- you know, I don't want to get into that. I don't think it's relevant to this thing.

(Hickey depo. pp. 46-47)

These objections are frivolous. Mr. Hickey filed an answer on behalf of the defendants denying Alice's claim and saying that the law did not require payment to Alice. If Mr. Hickey *knew* that he was filing false and frivolous defenses, this is both barratry and bad faith. Certainly the plaintiff has a right to ask him what he *knew* about the well defined law and the facts, at the time he filed this answer and defended this claim.

## CONCLUSION

Based upon all the foregoing, Alice Torres respectfully request that the court enter and order overruling defendants objections to the discovery discussed above, and requiring defendants to provide appropriate responses.

Torres v. Beverly Enterprises, Inc. *et al.*  
Brief in Support of Plaintiff's Motion to Compel

Civ. 01-5056

Dated this \_\_11\_\_ day of January, 2002.

By: _____*/s/ Mike Abourezk*_____  
Mike Abourezk  
ABOUREZK LAW FIRM  
Attorneys for Plaintiff  
Post Office Box 9460  
117 Knollwood Drive  
Rapid City, South Dakota 57709  
(605) 342-0097

and

Jim Leach  
Viken, Viken, Pechota, Leach & Dewell  
Attorneys for Plaintiff  
1617 Sheridan Lake Road  
Rapid City SD 57702  
(605) 341-4400

17